## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THOMAS O. BASTIAN,

       **Plaintiff,**

      **v.**                            **Civ. No. 21-350 WJ/JFR**

HEATHER JARAMILLO, TIMOTHY HATCH,
M. MARTIN, M. MONTOYA, R. NEWTON,
FNU PADILLA, ALISHA TAFOYA LUCERO, and
C. BAKER,

       **Defendants.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court by Order of Reference[1] in accordance with 28

U.S.C. §§ 636(b)(1)(B), (b)(3), and *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 489

(10th Cir. 1990).  Doc. 12.  On March 8, 2023, Defendants filed their *Motion to Dismiss, or in the*

*Alternative Motion for Summary Judgment, and Motion for Summary Judgment or Dismissal on*

*the Grounds of Qualified Immunity* ("Motion").  Doc. 35.  Plaintiff responded in opposition on

July 31, 2023, and Defendants replied on October 31, 2023.  Docs. 72, 83.  The Motion is ripe

for decision.

      Plaintiff is litigating this case pro se.  The Court is cognizant of its duty to liberally

construe his pleadings.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  In lieu of

---

[1]     By an Order of Reference filed May 18, 2022 (Doc. 12), the presiding judge referred this matter to the
undersigned to conduct hearings as warranted and to perform any legal analysis required to recommend an ultimate
disposition of the case.

engaging in traditional discovery, the Court ordered Defendants to compile and submit a report pursuant to *Martinez v. Aragon*, 570 F.2d 317, 320 (10th Cir. 1987).  Doc. 20.  Defendants submitted their *Martinez* Report on March 8, 2023.[2]  Doc. 32.  Plaintiff responded on July 31, 2023.  Doc. 73.  The Court's order directing Defendants to prepare the *Martinez* Report notified the parties that the Court would use it to resolve motions for summary judgment.  Doc. 20 at 2-3. The Court does so here.

For the reasons that follow, the undersigned recommends that the presiding judge **GRANT** Defendants' Motion and thereby enter summary judgment in their favor as to all of Plaintiff's claims.

## I. BACKGROUND

Plaintiff is serving a natural-life prison sentence for a criminal conviction from state court in Arizona.  Doc. 1 at 7-8.  He was transferred to the custody of the New Mexico Corrections Department ("NMCD") pursuant to the terms of an interstate corrections compact in 2019.  *Id.* Plaintiff arrived at the Northeast New Mexico Correctional Facility ("NENMCF") on August 6, 2020.  *Id.*  On April 15, 2021, Plaintiff commenced the instant lawsuit against eight NMCD officials in their official and personal capacities, alleging constitutional violations under 42 U.S.C. § 1983.  Doc. 1 at 1-6.  In Counts One and Three, Plaintiff alleges violations of his rights secured under the First Amendment.  *Id.* at 9, 17.  In Count Two, Plaintiff alleges violations of his Sixth Amendment right to counsel.  *Id.* at 13.  In Count Four, Plaintiff alleges violations of his Fourteenth Amendment right to due process.  *Id.* at 18.

---

[2]        The Court granted Defendants leave to file certain exhibits to the *Martinez* Report *in camera* as well as an unredacted copy of their Motion.  Doc. 30.  The Court cites only to the redacted, publicly available versions of each (Docs. 32, 35), unless otherwise noted.  The Court previously determined that providing Plaintiff with an unredacted copy of the *Martinez* Report is unnecessary and finds no reason to depart from that ruling here.  Doc. 79 (citing *Everson v. McKune*, 30 F.3d 141 (10th Cir. 1994) (unpublished table decision)).

## II. ANALYSIS

**A.    The Pleadings**

The Court begins by outlining Plaintiff's allegations against Defendants in his Second Amended Complaint ("Complaint"). It then turns to the parties' arguments with respect to the instant Motion before discussing the legal standards germane to its resolution.

*1.    Plaintiff's Complaint*

Plaintiff is presently in the custody of the Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR"). Doc. 1 at 3. Each of Plaintiff's claims bears on incoming and outgoing mail from his time in custody at NENMCF.

Plaintiff alleges that, in September 2020, Defendants Jaramillo, Hatch, Montoya, and Martin acted together in issuing a directive to Defendants Newton and Padilla that Plaintiff not be "permitted to send or receive any mail or correspondence" from Kelly Sgrillo, Plaintiff's fiancé, "or any other member of the public" including Plaintiff's "Court[-]Appointed Attorneys and Attorney Agents," who are not his kin. Doc. 1 at 9-10. Plaintiff claims he "mailed out a total of 41 individual pieces of mail/correspondence" to Kelly Sgrillo, but "Defendants Newton and Padilla refused to mail each and every one," holding them instead, and allowing them "to sit in the facility mailroom, often times for many weeks," before eventually returning to him unprocessed. *Id.* at 10. Plaintiff further claims that Defendants Newton, Padilla, Martin, Hatch, Montoya, and Jaramillo refused to deliver 36 pieces of incoming mail from Kelly Sgrillo. *Id.* Plaintiff also claims that Defendants Newtown, Padilla, Martin, Hatch, and Jaramillo refused to deliver "a total of 19 individual pieces of incoming mail from Stormy Sgrillo," who Plaintiff claims is his stepdaughter, because she is not Plaintiff's kin. *Id.* Plaintiff alleges that he

attempted to mail a number of pieces of mail to individuals and an organization, but Defendants

Newton, Padilla, Martin, Montoya, Hatch, and Jaramillo refused to mail any of them.  *Id.*

Additionally, Plaintiff alleges that, Defendant Newton "opened, photocopied, read, and

refused to deliver" mail marked "Legal Mail" from Dana Young, his "Attorney Agent," and

subsequently attempted to cover-up that the same was legal mail opened outside of Plaintiff's

presence.  *Id.* at 13.  Plaintiff further alleges that Defendants Newton, Martin, and Jaramillo

"opened, photocopied, and read [his] properly marked and labelled incoming Legal Mail"

outside of his presence.  *Id.*  Plaintiff claims that Defendant Newton told him "she was only

doing what Defendant[s] Jaramillo and Martin asked her to do" and Defendant Martin told him

that "Defendant Jaramillo instructed [me] to open the Legal Mail" prior to giving it to Plaintiff.

*Id.*  Plaintiff also claims that "Defendant Newton opened a piece of properly marked and labelled

incoming Legal Mail addressed to [Plaintiff] and sent by" an attorney outside of his presence.

*Id.*  According to Plaintiff, Defendant Newton told him "she [was] simply following the

directives of Defendants Martin and Jaramillo."  *Id.* at 14.  Plaintiff further alleges that

Defendant Newton refused to mail 27 pieces of legal mail "because Defendants Baker, Martin,

Jaramillo, Hatch, and Montoya informed Defendant Newton and Padilla that [Plaintiff] has no

right to correspond with any individual that [sic] is not proven 'Kin.'"  *Id.* at 15.  Plaintiff claims

this "chilled and prohibited" his ability to communicate with legal counsel."  Plaintiff also

alleges that "Defendants Jaramillo, Hatch, Martin, Baker, and Montoya issued a directive to

Defendants Newton and Padilla" to prohibit him from communicating via mail with Kelly

Sgrillo in her capacity as a witness in a civil court case (unrelated to the instant litigation).  *Id.*

Finally, Plaintiff claims that "Defendants Newton and Padilla failed to provide [him] with

a formal Notice of Rejection for a total of 145 individual pieces of incoming and outgoing Legal

and Non-Legal mail that they refused to mail, deliver, and process." *Id.* at 18.  He alleges that "Defendants Jaramillo, Martin, and Baker informed [him] that he is prohibited from filing individual complaints or grievances on each rejection because [he] had no inherent right to mail." *Id.*  According to Plaintiff, Defendants Hatch and Jaramillo issued a total ban on mail to and from Kelly Sgrillo and provided him no hearing or appeal regarding the same.  *Id.*

In Plaintiff's view, the allegations set forth above give rise to four claims: violation of his "First Amendment right to send and receive non-legal/privileged mail," *id.* at 9, violation of his "Sixth Amendment right to counsel," *id.* at 13, violation of his "First Amendment right to have Legal Mail opened" in his presence, *id.* at 17, and violation of his "Fourteenth Amendment right to Due Process," *id.* at 18.

2.      *Defendants' Motion*

Defendants seek dismissal or summary judgment on all of Plaintiff's claims.  As grounds, Defendants first argue that Plaintiff failed to exhaust his administrative remedies for all claims except for the mail restriction concerning mail to and from Kelly Sgrillo.  Doc. 35 at 32. Defendants further argue that suspending mail to and from Kelly Sgrillo and Stormy Sgrillo was constitutional.  *Id.* at 35.  Defendants also contend that Plaintiff has not properly asserted a claim for a violation of his Sixth Amendment right to counsel because the mail at issue concerned civil litigation, rather than a criminal case.  *Id.* at 44.  With respect to Plaintiff's Fourteenth Amendment claim, Defendants argue that Plaintiff was not entitled to due process because he did not have a protected liberty or property interest as his mail restrictions stemmed from legitimate security concerns.  *Id.* at 46.  Nevertheless, according to Defendants, Plaintiff received notice and an opportunity to be heard concerning the suspension of mail to and from Kelly Sgrillo and Stormy Sgrillo.  *Id.* at 47.  Moreover, Defendants aver that Plaintiff does not have standing to

bring a claim for want of due process under the Fourteenth Amendment.  *Id.* at 48.  Lastly, Defendants raise the defense of qualified immunity.  *Id.* at 49.

       3.     *Plaintiff's Response[3]*

Plaintiff responds to Defendants' Motion by disputing their assertion that he failed to exhaust his administrative remedies as to all of his claims.  Doc. 72 at 19.  Plaintiff argues that the restrictions on his mail with Kelly Sgrillo and Stormy Sgrillo did not serve a penological interest.  *Id.* at 30, 35.  Plaintiff resists Defendants' claim of qualified immunity.  *Id.* at 44. Finally, Plaintiff states that he "abandons his claims against Defendant Tafoya Lucero[4] and his Sixth and Fourteenth Amendment claim[s]."  Doc. 72 at 46.  The Court considers these claims no further and therefore recommends awarding summary judgment to Defendants on these claims. *See Hinsdale v. City of Liberal,* 19 F. App'x 749, 768-69 (10th Cir. 2001) (affirming the grant of summary judgment for the defendants on claims abandoned by the plaintiff in his summary judgment briefing); *see also Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).

       4.     *Defendants' Reply*

Defendants reply that Plaintiff has demonstrated that he exhausted his administrative remedies only as to mail to and from Kelly Sgrillo.  Doc. 83 at 5.  Defendants reiterate their position that the restrictions placed on Plaintiff's mail to and from Kelly Sgrillo and Stormy

---

[3]     Plaintiff's responses to the *Martinez* Report and the Motion each contains a list of "Objections."  Docs. 72 at 5-7; 73 at 1-4.  To the extent these objections bear on the Court's earlier, non-dispositive rulings, e.g., ordering Defendants to compile a *Martinez* Report in lieu of engaging in traditional discovery, permitting Defendants to file portions of the *Martinez* Report *in camera*, and denying Plaintiff's request to appoint counsel, the time for objecting to these rulings has come and gone.  *See* Fed. R. Civ. P. 72(a) (providing that when a magistrate judge rules on "a pretrial matter not dispositive of a party's claim or defense," an aggrieved party "may serve and file objections to the order within 14 days" and "may not assign as error a defect in the order not timely objected to").  Any objections that pertain to the Court's findings and recommendations herein may be raised as appropriate pursuant to Fed. R. Civ. P. 72(b)(2).

[4]     Defendant Tafoya Lucero was named in all four of Plaintiff's claims.  Doc. 1 at 9-19.  Because Plaintiff has abandoned all claims against her, references to "Defendants" hereinafter should be read to her exclusion.

Sgrillo were constitutional. *Id.* at 13. Defendants argue that suspension of Plaintiff's mail to "any other non-kin, if it occurred," did not violate his First Amendment rights. *Id.* at 19. Defendants further argue that Plaintiff has failed to raise genuine issues of material fact. *Id.* at 26, 31. Finally, Defendants reiterate their argument for qualified immunity. *Id.* at 25, 30

**A.     Standard for Dismissal Under Rule 12(b)(6)**

Fed. R. Civ. P. 12(b)(6) allows a party to assert by motion the defense of "failure to state a claim upon which relief can be granted." "A Fed. R. Civ. P. Rule 12(b)(6) motion tests the sufficiency of the [c]omplaint." *Pueblo de Cochiti v. United States*, 647 F. Supp. 538, 542 (D.N.M. 1986). In deciding a motion to dismiss premised on Rule 12(b)(6), the Court accepts the factual allegations in the complaint as true and views them in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). While the facts in the complaint need not be detailed, they must be sufficient to allow the Court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citation omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration, internal quotation marks and citation omitted). Generally, the Court must consider only the allegations within the four corners of the complaint and avoid consideration of extraneous material. *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1286 n.1 (10th Cir. 2019); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

At this juncture, with the benefit of a *Martinez* Report, the Court will not review the pleadings under the standard governing a Rule 12(b)(6) motion to dismiss but will decide

Defendants' motion under a summary judgment standard. *See Ketchum v. Cruz*, 961 F.2d 916, 919 (10th Cir. 1992) (stating that it is appropriate to decide matters under a summary judgment standard where the district court considers a *Martinez* Report, "a document outside the pleadings").

**B.      Summary Judgment Standard**

A motion for summary judgment tests whether a trial on the claims presented is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). "The movant bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Whitehead v. Mgmt. & Training Corp.*, 524 F. Supp. 3d 1155, 1166 (D.N.M. 2021) (internal quotation marks and citations omitted). "A dispute is genuine if there's enough evidence on each side that a rational trier of fact could resolve the issue either way." *Rose ex rel. Rose v. Brown*, 14 F.4th 1129, 1138 (10th Cir. 2021). In the resolution of a summary judgment motion, the Court construes the evidence before it "in the light most favorable to the non-moving party." *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016) (internal quotation marks and citation omitted). But the Court will not weigh evidence or decide issues of credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986).

"For purposes of summary judgment, a prisoner's pleadings are treated as evidence if they allege specific facts based on the prisoner's personal knowledge and have been subscribed under

penalty of perjury." *Whitehead*, 524 F. Supp. 3d at 1167 (D.N.M. 2021) (citations omitted).

Declarations not made under the penalty of perjury are not proper summary-judgment evidence.[5]

*Estrada v. Cook*, 166 F. Supp. 3d 1230, 1238 (D.N.M. 2015).  "If a party fails to properly support

an assertion of fact or fails to properly address another party's assertion of fact . . . the court may

. . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  "All

material facts . . . will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ.

56.1(b).  "[I]t is the responding party's burden to ensure that the factual dispute is portrayed with

particularity, without depending on the trial court to conduct its own search of the record."  *Cross*

*v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (omission, internal quotation marks, and

citation omitted)).

## C.    Undisputed Material Facts

NMCD had "Correspondence Regulations" in place to address the handling of inmate

mail.  Docs. 32-2; 32-3.  These regulations define "dangerous contraband" to include

"intoxicants."  Doc. 32-2 at 1.  They define "legal mail" as "[a]ny letters, pleadings or legal

documents to or from an inmate's attorney of record, a judge, a court of law, or an opposing

attorney, to include the NMCD Office of General Counsel," and "privileged correspondence" as

"[a]ny correspondence to or from an attorney from whom the inmate is attempting to retain

services; with recognized agencies that provide legal assistance; and law enforcement agents or

agencies."  *Id.* at 2.  The regulations state, in pertinent part that "[a]ll inmates' mail or packages,

both incoming and outgoing, shall be opened and inspected for contraband.  Mail is read and

accepted or rejected based on legitimate institutional interests of order and security.  Inmates are

notified when incoming or outgoing letters are rejected."  *Id.*  They further state that "[i]nmates

---

[5]    Plaintiff's response (Doc. 72), and three of his declarations (Doc. 73 at 153-170) are not made under penalty of perjury.

are permitted to send sealed legal mail or privileged correspondence.  Staff, in the presence of

the inmate, may inspect outgoing legal mail and privileged correspondence for contraband before

it is sealed.  Incoming legal mail and privileged correspondence to inmates may be opened only

to inspect for contraband and only in the presence of the inmate, unless waived in writing or in

circumstances which may indicate contamination." *Id.* at 2-3.  The regulations provide that

"[i]ncoming and outgoing letters are held for no more than forty-eight hours excluding

weekends, holidays and emergency situations."  Doc. 32-3 at 2.

> With respect to inspecting mail, the regulations provide, in relevant part, that:

> 1. All outgoing mail from inmates, except legal mail and privileged correspondence
> will be routinely inspected for contraband.  2. Except legal mail and privileged
> correspondence, outgoing mail, [sic] will be read if there is reasonable suspicion to
> believe that the mail contains escape plans, other plans to commit a crime or to
> violate institutional rules or regulations, or constitutes a crime in and of itself.  3.
> All incoming mail, with the exception of legal mail and privileged correspondence,
> will be inspected for contraband.

*Id.*  The regulations allow for notice in writing to an inmate whose mail is rejected "with the

reason for the rejection indicated" and contestation of "the rejection through the inmate

grievance procedure." *Id.* at 2-3.  The regulations state "[o]utgoing mail will be rejected when

the mail contains contraband, escape plans, codes, or other plans to commit a crime or to violate

facility rules and regulations, is intentionally deceptive, harassing or would constitute a crime in

and of itself." *Id.* at 3.  The regulations further state that incoming mail will be rejected if

"[t]here is a clear and present danger that the mail will endanger the internal security of the

institution, contains escape plans or other plans involving the inmate in the commission of a

crime or the violation of institutional rules and regulations, or would constitute a crime in and of

itself." *Id.*  With respect to incoming and outgoing legal mail and privileged correspondence, the

regulations provide that it may be opened, inspected, and read to the limited extent necessary to

determine its legitimacy; in the presence of the inmate in an appropriate, secure area of the

facility by the Warden or a designee to help determine if the mail is legitimate, contains

contraband, or when there is an indication of contamination.  Opened privileged correspondence

will be documented on the **Receipt for Open Privileged Mail** form." *Id.* at 4-5.

Defendants Newton and Padilla were employed as Mailroom Clerks while Plaintiff was

incarcerated at NENMCF.  Docs. 32-33 at 1; 32-37 at 1.  Defendant Newton maintained an

"Outgoing Legal Mail Tracking Log" and an "Incoming Legal Mail and Privileged

Correspondence Log."  Doc. 32-37 at 3.  Attached to the "Incoming Legal Mail and Privileged

Correspondence Log" are documents tilted "Receipt for Open Privileged Mail," which are signed

by the officer who delivered the mail to the inmate and opened the legal mail in the inmate's

presence to inspect for contraband and signed and dated by the inmate. *See, e.g.*, Doc. 32-5 at 3.

Based on information Defendant Jaramillo received from confidential informants in

August and September 2020, she began an investigation[6] into whether Plaintiff was using the

mail to introduce drugs into NENMCF.  Doc. 34-3 at 5, 9-10 (*in camera*).  On September 25,

2020, Plaintiff was placed in Temporary Restrictive Housing because he was the subject of an

investigation by the Security Threat Intelligence Unit ("STIU").  Doc. 32-27 at 20.  In the course

of this investigation, Defendant Jaramillo received and reviewed text messages from Kelly

Sgrillo to the girlfriend of another inmate. *See* Doc. 32-7 at 28-31.  The messages contain

---

[6]      Plaintiff disputes the facts surrounding Defendant Jaramillo's investigation.  But the only piece of proper
summary-judgment evidence upon which he relies is the declaration of Kelly Sgrillo.  Doc. 72 at 10 (citing Doc. 73
at 175).  Therein, she states that she fully complied with NMCD policy for mail to inmates and never violated the
same.  Doc. 73 at 175.  This is insufficient to dispute the material facts on this issue presented by Defendants.

The Court owes deference to the professional judgment of prison officials as reflected in their affidavits.
*Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006).  "To defeat summary judgment, it is not enough for [the]
plaintiff to disagree with views expressed in the affidavit; he must point to evidence creating genuine factual disputes
that undermine those views." *Id.*

Moreover, in a declaration not made under penalty of perjury, Plaintiff alleges a conspiracy of sorts on behalf
of Defendants, possibly as the reason behind the investigation of Plaintiff. *See* Doc. 73 at 166-170.  Of course, the
Court cannot consider this. *Estrada*, 166 F. Supp. 3d at 1238.

information on how Kelly Sgrillo mailed or attempted to mail drugs[7] to Plaintiff while he was

incarcerated.  *Id.*  The messages also contain threatening language.  *Id.*  Based on this

investigation, Defendant Jaramillo determined that Plaintiff and Kelly Sgrillo "are dangerous and

have the means to hurt someone should they be allowed to continue their operation."  Doc. 34-3

at 10 (*in camera*).  On October 26, 2020, Defendant Jaramillo reported the results of her

investigation to Defendant Hatch: "[T]here is evidence that [Plaintiff] and his fiancé . . . Kelly

Sgrillo have introduced narcotics previously, using both regular mail and legal mail channels.

Furthermore, it is my conclusion that they will continue to abuse this system."  Doc. 32-15.  She

recommended suspension of all correspondence between Plaintiff and Kelly Sgrillo for one year,

with re-evaluation thereafter.  *Id.*  Defendant Hatch approved the suspension on November 2,

2020.  *Id.*; Doc. 32-39 at 3.

     While Plaintiff was an inmate at NENMCF, Kelly Sgrillo received mail from Plaintiff at

P.O. Box 28543, Santa Fe, New Mexico, 87592.  Doc. 32-8 at 17; *see, e.g.*, Doc. 32-8 at 6.

Defendant Hatch understood Kelly Sgrillo to be Plaintiff's girlfriend or fiancé, and Stormy

Sgrillo to be Kelly Sgrillo's daughter.  Doc. 32-39 at 3.  Plaintiff would send mail addressed to,

and receive mail from, P.O. Box 28543, Santa Fe, New Mexico, 87592, the same address used

by Kelly Sgrillo, purportedly to communicate with Stormy Sgrillo.  *Id.*  Defendant Jaramillo

determined that Plaintiff's mail to and from Stormy Sgrillo was a security threat.  Doc. 38 at 5.

At least some of this mail purportedly to and from Stormy Sgrillo was actually being used to

---

[7]    Defendant Jaramillo was previously an STIU Coordinator at another correctional facility and has a certification from the Office of Professional Standards ("OPS").  Doc. 38-1 at 1.  As an OPS certified investigator, she is certified to conduct administrative investigations, including those on gangs, narcotics, and assaults.  *Id.*  She understood certain terms in the text messages, i.e., "strips" and "spice," to be references to intoxicating drugs.  *Id.* at 3.

send messages to and from Kelly Sgrillo. *Id.*; *see, e.g.*, Doc. 32-22 at 3, 7. After learning of this

concern, Defendant Hatch suspended Plaintiff's mail with Stormy Sgrillo.[8] Doc. 32-39 at 3.

On October 20, 2020, Defendant Jaramillo was copied on an email from Cheryl Frazier,

the Prison Rape Elimination Act Manager for NENMCF. Docs. 32-28 at 1; 38-1 at 5. In

relevant part, the email said: "Dana Young . . . is a private investigator, **not** an attorney and per

Policy, [Plaintiff] may **not** make privileged calls to her. He can write to her or put her on his

phone list, but he may not use Attorney calls to speak to her." Doc. 32-28 at 1. Defendant

Jaramillo understood this to confirm that Dana Young was not an attorney, and thus mail

between her and Plaintiff should not be treated as Legal Mail. Doc. 38-1 at 5. On November 2,

2020, a piece of mail from "Detective Dana Young" of "Discovery Detective Group" arrived at

NENMCF. Docs. 32-5 at 41; 73 at 135. The Incoming Legal Mail Log and the Inmate Receipt

for Privileged Mail indicate that this mail arrived "torn and taped."[9] Doc. 32-5 at 37, 41. The

Incoming Legal Mail Log also indicates it was "Opened by Warden or Designee." *Id.* at 37.

Defendant Jaramillo opened one piece of mail from Dana Young to Plaintiff, which was

subsequently delivered to Plaintiff.[10] Doc. 38-1 at 5.

On November 10, 2020, Plaintiff had a hearing before a disciplinary officer on two

charges, dealing in dangerous drugs and fraud, for which he was found guilty. Doc. 32-7 at 2.

---

[8]     The reason provided by Defendants for rejecting some mail with Stormy Sgrillo was because there was no proof of her kinship to Plaintiff. Docs. 32-22; 32-23. Defendants engaged in discussion about this reasoning, the extent and outcome of which are unclear. Docs. 32-36 at 2; 38-1 at 6. Ultimately, however, Plaintiff's mail with Stormy Sgrillo was restricted based on the security threat detailed above. Docs. 32-39 at 3; 38-1 at 6. And while Plaintiff attempts to dispute this fact, Doc. 72 at 12, the evidence demonstrates that, even if lack of proof of kinship was a stated reason for rejection of this mail, it was indeed rejected for security reasons. Docs. 32-24 (referencing no "proof of kindship" but stating mail was rejected "due to the possible security threat"); 32-25 (same).

[9]     *See infra* note 16.

[10]    Defendants cannot confirm if this is the letter at issue here. Doc. 38-1 at 5.

Plaintiff's disciplinary consequences were loss of good time, and temporary loss of phone, visitation, and commissary privileges.  *Id.*

The administrative remedies for an inmate in NMCD's custody are exhausted upon completion of the grievance process through Department-level appeal.  Doc. 32-4 at 2.  Because there are a significant number of intricacies with respect to the facts surrounding the exhaustion process here, and many of the questions on which Defendants request summary judgment as to this issue are resolved by reference to the applicable law, the Court reserves discussion of the materials facts relevant to exhaustion for its analysis of the issue below.

**D.   Defendants Are Entitled to Summary Judgment on Plaintiff's Remaining Claims (Counts One and Three)**

As illustrated above, Plaintiff proceeds only on his First Amendment claims.  Moreover, the parties agree that Plaintiff exhausted his administrative remedies with respect to the suspension of his mail to and from Kelly Sgrillo.  Doc. 83 at 5 (citing Doc. 32-13 at 1).  So the Court focuses only on whether Plaintiff exhausted his administrative remedies for his other claims, as divided below.

*1.    Exhaustion Under the PLRA*

The Prison Litigation Reform Act ("PLRA") provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted."  42 U.S.C. § 1997e(a).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  "PLRA's exhaustion requirement applies to all inmate suits about prison life."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "[T]he burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA lies with the

defendant." *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).  Once this is done, "the

onus falls on the plaintiff to show that remedies were unavailable to him." *May v. Segovia*, 929

F.3d 1223, 1234 (10th Cir. 2019) (internal quotation marks and citation omitted).

It is true, as Plaintiff argues, that "[w]here prison officials prevent, thwart, or hinder a

prisoner's efforts to avail himself to an administrative remedy, they render that remedy

'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones*, 607 F.3d

1245, 1250 (10th Cir. 2010).  However, inmates cannot exhaust their administrative remedies by

failing to make use of them. *Jernigan v. Stuchell*, 304 F.3d 1030, 1033 (10th Cir. 2002); *Hoover

v. West*, 93 F. App'x 177, 181 (10th Cir. 2004).  Plaintiff argues that he exhausted his

administrative remedies or was otherwise unable to do so because such process was unavailable

to him.  Doc. 72 at 19-27.

a.   Outgoing Legal Mail

Plaintiff relies on two Inmate Formal Complaints and one grievance form that concern

incoming legal mail as evidence that he exhausted his administrative remedies.  *See* Doc. 73 at

50-67.  He did not participate in the grievance process as to the 27 pieces of outgoing legal mail

at issue.  Obviously, without initiation, such process cannot be appealed, which is a necessary

component for administrative remedy exhaustion.  *See* Doc. 32-4 at 2.  The time-period at issue

here is October 10, 2020, to December 14 or 19, 2020.  Docs. 1 at 14; 72 at 23.  Plaintiff states

that "since the subject of Plaintiff's Legal Mail being opened outside of his presence was at all

times between November 18, 2020, and December 14, 2020, currently under review, Plaintiff

was prohibited from grieving the claim."  Doc. 72 at 24 (internal quotation marks and citations

omitted).  He relies on the NMCD policy for grievances which provides that an issue is non-

grievable if it is the subject of a prior grievance finally determined or currently under review.

Doc. 72 at 24; *see* Doc. 32-4 at 6.  Plaintiff cites only to his own declaration, wherein he states

that he was not permitted to grieve the rejection of the 27 pieces of outgoing legal mail "because

[he] grieved it once."  Doc. 73 at 151.  But this argument is not supported.  During this same

time-period, Plaintiff did file an informal complaint, grievance, and appeal of a piece of outgoing

legal mail (not at issue here) that he alleged was not sent. [11]  Doc. 32-12 at 1-8.  Again, what

Plaintiff cites as evidence that he could not grieve this claim because the subject matter was

already under review does not support his argument.[12]  *See* Doc. 73 at 51-52 (Inmate Informal

Complaint regarding rejection of incoming mail), 56-57 (Inmate Informal Complaint regarding

incoming mail delivered on November 3, 2020), 59-60 (Inmate Grievance regarding the same

incoming mail delivered on November 3, 2020).

On this record, the Court concludes that Defendants have borne their burden to

demonstrate Plaintiff did not exhaust his administrative remedies with respect to his outgoing

legal mail as required by the PLRA, and Plaintiff has not sufficiently demonstrated facts to the

contrary.  *See Jones*, 549 U.S. at 211; *May*, 929 F.3d at 1234; *Roberts*, 484 F.3d at 1241; *Rice v.*

*United States*, 166 F.3d 1088, 1092 (10th Cir. 1999) (stating that "more than a scintilla of

evidence" is necessary to create a genuine issue of material fact).  Thus, those issues cannot be

raised here.

---

[11]     This piece of mail was located and mailed.  Doc. 32-12 at 1-8.

[12]     Plaintiff's position is further undercut by the evidence he submits.  While it does not speak to his outgoing legal mail, it does indicate that Defendant Martin recommended Plaintiff file a formal grievance for the incoming mail he claimed was opened, casting doubt on Plaintiff's other argument that he was told he could not grieve his concerns about his outgoing legal mail.  *Compare* Doc. 73 at 56, *with* Doc. 73 at 151.  Nothing in the record demonstrates that Plaintiff attempted to grieve these concerns but was precluded from doing so.

b.      Incoming and Outgoing Non-Legal Mail

With respect to Plaintiff's incoming and outgoing non-legal mail, aside from that to and from Kelly Sgrillo, mail to and from a number of individuals, including Stormy Sgrillo and an organization, is at issue.  Doc. 1 at 10.  Plaintiff did not participate in the grievance process as to these claims.  Plaintiff relies on an Inmate Grievance wherein he grieves Defendant "Jaramillo's illegal, unconstitutional, and retaliatory banned [sic] on me and my wife being able to communicate."  Doc. 32-13 at 10-13.[13]  Plaintiff again argues that the NMCD policy that an issue is non-grievable if it is the subject of a prior grievance finally determined or currently under review prohibited him from grieving these claims.  Doc. 72 at 24-25; *see* Doc. 32-4 at 6. This argument is unsupported by the record.  Plaintiff avers that in September 2020, he was told by Defendant Newton that he was "no longer permitted to send or receive any form of incoming or outgoing mail, legal or non-legal, per the directives of Defendants Jaramillo, Hatch, Montoya, and Martin."  Doc. 73 at 146.  At the same time, the Inmate Grievance upon which Plaintiff relies for his position that he could not grieve incoming and outgoing non-legal mail was filed on October 21, 2020, with the date of incident as October 16, 2020.  Doc. 32-13 at 10.  Plaintiff also directs the Court to an Inmate Informal Complaint dated December 11, 2020, with the date of incident as December 10, 2020, wherein he claimed: "On October 11, 2020, I received notice that per [Defendant] Martin, my mail to my step-daughter is banned, prohibited, and that I am not allowed to write anyone unless I prove kinship to them," Doc. 32-24, and another dated December 10, 2020, with the date of incident of December 10, 2020, wherein he claimed: "On

---

[13]      This Inmate Grievance also refers to Kelly Sgrillo as a witness in Plaintiff's pending civil cases.  Doc. 32-13 at 12.  He also claims that the prohibition on his mail with Kelly Sgrillo caused "mail sent to other individuals to be rejected and returned" because the "address and P.O. Box on the street is the address" used for multiple people, including a friend who lived with Kelly Sgrillo, his mother-in-law, his stepson and daughter, and his brother-in-law. *Id.* at 13.  None of this demonstrates that Plaintiff was grieving anything except the prohibition on his mail with Kelly Sgrillo.

December 10, 2020, I received a mail rejection notice that [Defendant] Martin has banned and prohibited me from writing/corresponding with my step-daughter, Stormy Sgrillo."  Doc. 32-25.

So, while Plaintiff claims he could not grieve the issue of incoming and outgoing non-legal mail from October 16, 2020, until January 11, 2021, because his grievance regarding his mail with Kelly Sgrillo was "under review" and of the same "subject" such that his other issue was not grievable, his argument is meritless—he was aware of the restriction on his mail at the time he filed his grievance with respect to mail with Kelly Sgrillo, and he filed other informal complaints during that time.  Insofar as Plaintiff's arguments can be read to indicate he misconstrued the grievance policy with respect to the subject of an issue under review, *see* Doc. 72 at 25, the result is the same.  *Cf. Simmons v. Stus*, 401 F. App'x 380, 381-82 (10th Cir. 2010) (stating that ignorance of grievance procedures does not excuse failure to comply with the PLRA's exhaustion requirement).  In sum, nothing before the Court indicates that he attempted to grieve the mail at issue and was unable to do so.

Turning specifically to Plaintiff's mail with Stormy Sgrillo, as illustrated above, Plaintiff filed only two informal complaints on this matter and no grievances.  Docs. 32-34; 32-35; *see* Doc. 32-4 (NMCD grievance policy).  Plaintiff argues that he could not exhaust the grievance process as to his mail with Stormy Sgrillo because he was transferred to ADCRR prior to the deadline to file a grievance and he could not file a grievance because of ADCRR's policies. Doc. 72 at 25-26.  Plaintiff was transferred to ADCRR on December 22, 2020.  Doc. 35 at 76. His two informal complaints were answered on December 18, 2020.  Docs. 32-34; 32-35.  The deadline for Plaintiff to file a grievance was December 28, 2020.  *See* Doc. 32-4 at 9 (providing five working days to file a grievance).  At the most, then, Plaintiff had four days in toto to file a grievance.

Generally, "[t]he mere fact that [an inmate] was transferred . . . does not direct the conclusion that he was thereby prevented from filing a grievance." *Turrietta v. Barreras*, 91 F. App'x 640, 642 (10th Cir. 2004).  But this does not speak to the somewhat unique circumstances at play here, for which a clear answer is elusive.  *See Berry v. Kerik*, 366 F.3d 85, 88 n.3 (2d Cir. 2004) ("We have no occasion to consider the exhaustion requirement in situations where only a brief interval elapses between the episode giving rise to the prisoner's complaint and the prisoner's transfer to the custody of another jurisdiction.").  The PLRA does not define the parameters of grievance procedures.  *See Jones*, 549 U.S. at 218.  NMCD's grievance policy permitted Plaintiff five working days with which to grieve his issues.  Several courts have concluded that a period of a few days within which to grieve an issue before an inmate is transferred renders administrative remedies unavailable.  *See, e.g.*, *Pauls v. Green*, 816 F. Supp. 2d 961, 986 (D. Idaho 2011); *Hartry v. Cnty. of Suffolk*, 755 F. Supp. 2d 422, 433-34 (E.D.N.Y. 2010); *Warren v. Parosa*, No. 16-CV-1694, 2018 WL 566213, at *2-*4 (D. Or. Jan. 26, 2018); *Burns v. Moore*, No. 99-CV-966, 2002 WL 91607, at *6 (S.D.N.Y. Jan. 24, 2002) ("This [c]ourt can imagine a situation where a prisoner could plausibly argue that he was effectively denied access to an administrative remedy because he could not file a grievance . . . after he was transferred from the facility in which his complaint arose.  For example, if an inmate's injury were to arise shortly before he was transferred from the facility, it might be impossible or extremely difficult for him to file a grievance prior to his transfer.")  In this same vein, another court has concluded:

> If, in fact, [the p]laintiff was not transferred until after a grievance could have been *filed and processed*, then his claim must be dismissed for failure to exhaust administrative remedies.  On the other hand, if he did not have an opportunity to avail himself of the grievance procedure because of his transfer, then he is not required to exhaust his administrative remedies.

*Muller v. Stinson*, No. 99-CV-0624, at 2000 WL 1466095, at *2 (N.D.N.Y. Sept. 25, 2000) (emphasis added).

Considering the foregoing, the Court is unconvinced that Plaintiff was able to exhaust his administrative remedies with respect to mail to and from Stormy Sgrillo.  While Plaintiff could have filed a grievance in the abbreviated timeframe between the answers to his informal complaints and his transfer to ADCRR, it is not at all clear that such grievance would have been processed while Plaintiff was still in the custody of NENMCF, and he certainly would not have been able to appeal and thus exhaust his administrative remedies under NMCD's grievance policy.  Doc. 32-4 at 2, 10.  The Court is cognizant that the policy also provides that "[i]n the event of a transfer, an inmate will be able to file any grievance directly with the Grievance Officer at the appropriate facility."  *Id.* at 11.  However, as Plaintiff notes, this policy applies to inmates in the custody of NMCD.  *Id.* at 1.  Plaintiff was transferred to ADCRR and told that NMCD's grievance policy did not apply, and he could not have NMCD grievance forms.  Doc. 73 at 123, 125.[14]  And while Defendants note that any request Plaintiff made in attempts to pursue grieving his claims fell outside of the deadline imposed under NMCD's policy, this is of no consequence.  Doc. 83 at 13 n.13.  Even if such requests could have been completed timely (a tall task, given the timeline outlined above), Plaintiff still would not have been able to grieve his claim under NMCD policy and thus exhaust his administrative remedies.  The Court therefore concludes that administrative remedies were unavailable as to issues specific to mail with Stormy Sgrillo and proceeds to consider them below.

---

[14]    In addition to these documents, Plaintiff directs the Court to a declaration made by him (Doc. 73 at 159-164). Doc. 72 at 26.  The Court does not consider this declaration because it is not made under penalty of perjury, and thus not proper summary judgment evidence.  *Estrada*, 166 F. Supp. 3d at 1238.

In sum, with the exception of mail to and from Stormy Sgrillo, the Court concludes that Defendants have borne their burden of demonstrating that Plaintiff did not exhaust his administrative remedies with respect to incoming and outgoing non-legal mail with the individuals and entity he identifies, and thus those issues cannot be raised here. *See Jones*, 549 U.S. at 211; *Roberts*, 484 F.3d at 1241.

   c. <u>Incoming Legal Mail</u>

With respect to Plaintiff's incoming legal mail, a card and letter from Dana Young, and a letter from an attorney are at issue. Plaintiff alleges that this mail was opened outside of his presence. Docs. 1 at 13; 72 at 22. As for his administrative remedies, Plaintiff points to an Inmate Formal Complaint and an Inmate Grievance as to the card and letter from Dana Young, respectively, but nothing for the letter from the attorney. Docs. 73 at 51-54, 59-60. The Court addresses each piece of mail individually.

As to the card from Dana Young, Plaintiff filed an Inmate Informal Complaint on October 14, 2020, in which he complained that he received a rejection slip regarding mail from his "Legal Private Investigator." Doc. 73 at 51-52. Therein, he complained that he was not required to sign the rejection form and marking a box indicating whether he wanted to appeal the rejection. *Id.* at 52. On October 20, 2020, Plaintiff and Defendant Martin signed the Inmate Informal Complaint, acknowledging that the matter therein has been resolved on the basis that "the forms being utilized are outdated and NMCD policy no longer requires inmate signature on rejections." *Id.* at 51. This is consistent with NMCD's Correspondence Regulations. Doc. 32-3 at 8. Plaintiff argues that administrative remedies were unavailable to him with respect to this claim because Defendant Martin told him he could not grieve it, based on the NMCD policy outlined above. Doc. 72 at 21. So, Plaintiff argues that, on the basis of "erroneous information,"

he "ma[de] the misinformed decision to resolve" the matter.  *Id.*  This argument is meritless because even if the Court accepted it, Plaintiff's informal complaint raises an entirely different basis for his claim.  Specifically, he never complained about the card from Dana Young being opened outside of his presence until he filed the instant lawsuit.  The basis for filing his informal complaint was the lack of his signature on the rejection form.  *See Barnes v. Allred*, 482 F. App'x 308, 311 (10th Cir. 2012) ("[The] grievances did not provide prison officials with enough information to internally resolve the issue in [the] civil complaint. . . . While [the inmate]'s . . . grievances may have complained of issues related to those raised in his civil claim, the similarity of issues alone is insufficient to satisfy exhaustion of administrative remedies.").  Therefore, the Court concludes this claim is unexhausted and cannot be pursued here.

The letter from Dana Young was the subject of an Inmate Grievance Plaintiff signed on November 12, 2020.  Doc. 73 at 59.  Plaintiff has provided evidence that NMCD officials received this grievance, though nothing indicates Plaintiff received a response.  *Id.* at 65-71.  Defendants state that they "assume a genuine issue of material fact exists as to whether Plaintiff exhausted his administrative remedies on that letter."  Doc. 83 at 5.  But, according to Defendants, "while the failure to respond to a grievance may render an administrative process unavailable, Plaintiff never attempted to appeal or cure any non-response to his grievance, and thus he has not presented any evidence that he exhausted his administrative remedies on this claim."  *Id.* at 10.  Plaintiff notes that he was transferred to ADCRR before a response to his grievance was due and argues that, under NMCD's grievance policy, he exhausted his claims, having received no response.  Doc. 72 at 22.  The Court agrees.

The policy states, in relevant part, that "[i]n the event the grievance is not disposed of within the specified time limits, the inmate shall be deemed to have exhausted his administrative

remedies for that specific complaint."  Doc. 32-4 at 7.  "[F]ailure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable."  *Jernigan*, 304 F.3d at 1032.  Defendants maintain that they "have searched but have not been able to find the grievance or a copy in their records, nor have they found a response," and that they "have no record or confirmation that the grievance," as produced by Plaintiff, "is actually regarding the allegedly opened letter from Dana Young."  Doc. 83 at 10 n.10.  This does not matter.  It is their burden to demonstrate that Plaintiff did not exhaust his administrative remedies, *Roberts*, 484 F.3d at 1241, and they have not done so here.  On this record, the Court concludes that Plaintiff can proceed with his claim regarding the letter from Dana Young.

Finally, the letter from the attorney was not raised by Plaintiff in any informal complaint or grievance.  Plaintiff again argues that he was unable to raise this claim because of the NMCD policy for grievances which provides that an issue is non-grievable if it is the subject of a prior grievance finally determined or currently under review.  Doc. 72 at 23.  Specifically, Plaintiff argues that because he submitted a grievance concerning the letter from Dana Youung just before the issue of the letter from the attorney arose, he was precluded from raising the latter.  *Id.*  This argument remains unpersuasive.  Nothing in the record demonstrates that Plaintiff attempted to grieve the issue of the letter from the attorney and was prohibited from doing so.  To properly exhaust their administrative remedies under the PLRA, inmates are required to outline the actions giving rise to their claims: "A grievance obviously cannot exhaust administrative remedies for claims based on events that have not yet occurred.  Nor does a grievance exhaust administrative remedies for all future complaints of the same general type."  *Ross v. Cnty. of Bernalillo*, 365 F.3d 1181, 1188 (10th Cir. 2004), *abrogated on other grounds by Jones*, 549 U.S.

199; *see, e.g.*, *Logan v. Bunch*, No. 09-CV-1704, 2010 WL 3341318, at *3 n.2 (D. Colo. Mar. 24, 2010) (rejecting the plaintiff's argument that he "saw no need to pursue each individual issue separately" and concluding that he failed to exhaust his administrative remedies under the PLRA), *adopted* 2010 WL 3341378 (D. Colo. Aug, 23, 2010).  Finally, Plaintiff implies that he misunderstood the NMCD grievance policy he invokes here, stating that maybe it can be "reasonably interpreted to have more than one meaning," rendering it "ambiguous."  Doc. 72 at 23.  This argument is directly contrary to precedent: "When an administrative process is susceptible to multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion."  *Ross v. Blake*, 578 U.S. 632, 644 (2016).

In sum, the Court concludes that Plaintiff can proceed with his claim regarding the letter from Dana Young as Defendants have not borne their burden of demonstrating that Plaintiff failed to exhaust his administrative remedies.  However, as to the card from Dana Young and the letter from the attorney, the Court concludes Defendants have borne their burden, and Plaintiff cannot raise those issues here.  *See Jones*, 549 U.S. at 211; *Roberts*, 484 F.3d at 1241.

     *2.*     *Plaintiff's Exhausted Claims*

After disposing of Plaintiff's allegations for which he did not exhaust his administrative remedies, what remains are his allegations that Defendants interfered with his mail to and from Kelly and Stormy Sgrillo, and that they opened a letter from Dana Young outside of his presence.  A prisoner's right to incoming and outgoing mail is protected by the First Amendment.  *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010).  At this juncture, the Court must answer two questions.  First, was the restriction on Plaintiff's mail with Kelly Sgrillo and Stormy Sgrillo valid?  And second, has Plaintiff demonstrated a constitutional violation as to the letter from Dana Young?

a.    The Restriction on Plaintiff's Mail

This issue of restricting Plaintiff's mail is controlled by the Supreme Court's analysis in

*Turner v. Safley,* 482 U.S. 78, 89 (1987), wherein the Court held that "when a prison regulation

impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to

legitimate penological interests."

> Four factors guide the *Turner* analysis: (1) whether a rational connection exists
> between the prison policy regulation and a legitimate governmental interest
> advanced as its justification; (2) whether alternative means of exercising the right
> are available notwithstanding the policy or regulation; (3) what effect
> accommodating the exercise of the right would have on guards, other prisoners, and
> prison resources generally; and (4) whether ready, easy-to-implement alternatives
> exist that would accommodate the prisoner's rights.

*Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 750 (10th Cir. 2019) (quoting *Al-Owhali v.*

*Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012)).  "Although this standard is not toothless, courts

generally give prison officials considerable deference."  *Hum. Rts. Def. Ctr. v. Johnson Cnty.*,

507 F. Supp. 3d 1277, 1284 (D. Kan. 2020).  "This is especially true where a state prison is

involved."  *Id.*  "Ultimately, the burden is on the party challenging the regulation to prove it is

unconstitutional, and not on prison officials to prove it is constitutional."  *Id.* (citing *Wirsching v.*

*Colorado*, 360 F.3d 1191, 1200 (10th Cir. 2004)).  The Court addresses each *Turner* factor in

turn.

### *i.    Rational Connection*

"[P]rison security is a compelling state interest, and . . . deference is due to institutional

officials' expertise in this area."  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005); *see also*

*Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (stating that "protecting prison security . . . is

central to all other corrections goals" (internal quotation marks and citation omitted)); *Jones v.*

*Salt Lake Cnty.*, 503 F.3d 1147, 1156 (10th Cir. 2007) ("Prison security and safety are legitimate

governmental objectives.").  "Drug smuggling and drug use in prison are intractable problems."

25

*Overton v. Bazzetta*, 539 U.S. 126, 134 (2003).  Preventing illicit drug use is a legitimate penological interest under *Turner*.  *Hum. Rts. Def. Ctr. v. Bd. of Cnty. Comm'rs*, 654 F. Supp. 3d 85, 99 (D.N.H. 2023).  Mail restrictions can serve the penological purposes of preventing contraband smuggling and other criminal activity inside of a prison facilitated through the assistance of third parties outside of the prison.  *E.g.*, *Wardell*, 470 F.3d at 960.

Here, an investigation by Defendant Jaramillo, a prison official, resulted in a finding that Plaintiff and Kelly Sgrillo had used the mail to introduce drugs into the prison facility.  Doc. 32-15.  Additionally, Kelly Sgrillo and Stormy Sgrillo shared an address, and Defendants became concerned that Plaintiff was using mail through Stormy Sgrillo as a means to communicate with Kelly Sgrillo.  Docs. 32-22 at 3, 7; 32-39 at 3; 38 at 5.  Under these circumstances, Defendant Hatch approved the suspension of Plaintiff's mail with Kelly Sgrillo and Stormy Sgrillo.  Docs. 32-15; 32-39 at 3.  As discussed above, Plaintiff has provided no evidence creating genuine factual disputes that undermine the professional judgment expressed in Defendant Jaramillo's affidavit.  *See supra* note 6.  "Absent such evidence, [the] defendants' affidavit is sufficient to establish, on summary judgment, that the regulations do, in fact, serve the functions identified by the prison defendants."  *Wardell*, 470 F.3d at 960 (alteration, internal quotation marks, and citation omitted); *see also Wirsching*, 360 F.3d at 1200.  Therefore, the first *Turner* factor is easily satisfied.  It was entirely rational for Defendants to suspend Plaintiff's mail with these individuals given that the investigation results indicated this was a channel for introducing contraband into NENMCF.

### ii.    *Alternative Means*

Turning to the second factor, perfect alternatives are not required, they must only be available.  *Wirsching*, 360 F.3d at 1200.  Even still, a showing that no alternative means of

exercising a constitutional right is not conclusive, though it is evidence that a regulation may be unreasonable. *Overton*, 539 U.S. at 135.  Here, Plaintiff was deprived only of his mail with Kelly Sgirllo and Stormy Sgrillo, and only for a fixed period of time[15] before such restriction would be re-evaluated.  Docs. 32-15; 32-39 at 3.  He was not deprived of his ability to communicate with them through other means, such as by telephone or visitation.[16]  These are adequate alternative means of communication notwithstanding the restriction on Plaintiff's mail with Kelly Sgrillo and Stormy Sgrillo, and the second *Turner* factor is therefore satisfied.  *See Overton*, 539 U.S. at 135 (discussing a prohibition on certain visitation and identifying alternatives "of sufficient utility"); *Hum. Rts. Def. Ctr*, 654 F. Supp. 3d at 97-98 ("[W]hen a prison regulation limits a form of communication, the prison need not offer an identical alternative; it instead must offer other means of communication generally, such that the regulations does not result in a ban on expression altogether.").

### iii.    Effect of Accommodations

As to the third factor, if the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and prisoners alike," the Court should defer to the judgment of corrections officials.  *Turner*, 482 U.S. at 92.  This factor requires the Court to consider the potential "'ripple effect'" that accommodations of the asserted right will have in the prison.  *Id.* at 90-92.  Here, if Plaintiff was permitted to continue receiving correspondence from Kelly Sgrillo and Stormy Sgrillo, potentially containing contraband, the potential "ripple effect" is substantial, putting NENMCF personnel and prisoners at risk through

---

[15]    The Court notes that if this restriction had been imposed indefinitely, it would have a more difficult time meeting constitutional muster.  *See Beard v. Banks*, 548 U.S. 521, 535 (2006) ("[I]f faced with evidence that [the regulation was] a *de facto* permanent ban we might reach a different conclusion in a challenge to a particular application of the regulation." (omission, internal quotation marks, and citation omitted)).  That is not the case here.

[16]    The Court is aware that Plaintiff's alternative means of communication could only be exercised after he completed his disciplinary consequences.  *See* Doc. 32-7 at 2.  Those consequences are not at issue in this case.

the introduction of drugs into the facility. *See Overton*, 539 U.S. at 134. Thus, the Court

concludes that this factor is satisfied.

***iv.***     ***Easy-to-Implement Alternatives***

With respect to the last factor,

> the absence of ready alternatives is evidence of the reasonableness of a prison
> regulation, while the existence of obvious, easy alternatives may be evidence that
> the regulation is not reasonable, but is an exaggerated response to prison concerns.
> . . . This is not a least restrictive alternative test: prison officials do not have to set
> up and then shoot down every conceivable method of accommodating the
> claimant's constitutional complaint. Rather, this factor weighs against the
> regulation if the inmate can point to an alternative that fully accommodates the
> prisoner's rights at de minimis cost to valid penological interests.

*Wardell*, 470 F.3d at 961 (alterations, internal quotation marks, and citations omitted). Here,

there do not appear to be easy-to-implement alternatives. Again, the introduction of contraband

into NENMCF via mail is a legitimate penological concern that is rationally addressed through

restrictions on inmate mail. *Hum. Rts. Def. Ctr*, 654 F. Supp. 3d at 99; *e.g.*, *Wardell*, 470 F.3d at

960. Plaintiff has not suggested an obvious, easy-to-implement alternative that would have

maintained his mail rights with Kelly Sgrillo and Stormy Sgrillo while simultaneously

maintaining the security of NENMCF personnel and prisoners given Defendants' belief,

grounded in Defendant Jaramillo's investigation, that this mail was a channel for the introduction

of contraband to the facility. The Court sees none either. In short, Plaintiff has failed on this

factor, and the three preceding factors, to demonstrate that the temporary restriction on his mail

with Kelly Sgrillo and Stormy Sgrillo is unconstitutional. *See Wirsching*, 360 F.3d at 1200.

For these reasons, the Court concludes there is no genuine issue of material fact as to

Plaintiff's claim concerning his mail with Kelly Sgrillo and Stormy Sgrillo and Defendants are

entitled to judgment as a matter of law.

28

        b.    <u>The Letter from Dana Young</u>

"While a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.  Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail."  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (internal quotation marks and citations omitted).  Likewise, a prisoner cannot assert a First Amendment violation with respect to isolated incidents of mishandled legal mail where there is no evidence of improper motive.  *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990) ("[The d]efendants admitted to opening one piece of [the inmate]'s constitutionally protected legal mail by accident.  Such an isolated incident, without any evidence of improper motive or resulting interference with [the inmate]'s right to counsel or access to the courts, does not give rise to a constitutional violation."); *Bruscino v. Pugh*, 232 F. App'x 763, 764-65 (10th Cir. 2007); *Brown v. Williams*, 36 F. App'x 361, 363 (10th Cir. 2002); *Florence v. Booker*, 23 F. App'x 970, 972 (10th Cir. 2001); *Berger v. White*, 12 F. App'x 768, 771 (10th Cir. 2001); *see, e.g.*, *Bagguley v. Barr*, 893 F. Supp. 967, 972-73 (D. Kan. 1995) (concluding that opening three envelopes of legal mail "does not rise to the level of a constitutional violation); *Haston v. Galetka*, 799 F. Supp. 1129, 1132 (D. Utah 1992) (concluding that two incidents of prison employees opening an inmate's legal mail did not establish improper motive).

      There is a single piece of mail at issue here: the letter from Dana Young that Plaintiff claims was opened outside of his presence.  The Court assumes, *arguendo*, that this private investigator was an agent of his legal counsel and thus this mail was in fact privileged.  *See Vreeland v. Raemisch*, No. 12-CV-1921, 2013 WL 5462299, at *6 (D. Colo. Sept. 13, 2013) (assuming, without deciding, that an inmate's mail with his private investigator is privileged).

*But see Thomas v. Terhune*, No. 03-CV-5467, 2006 WL 581180, at *2 (E.D. Cal. Mar. 8, 2006) ("[M]ail from a private investigator does not constitute 'legal mail' within the protections of the constitution regardless of the contents."), *adopted* 2006 WL 1023428 (E.D. Cal. Apr. 18, 2006). The Court also assumes that Defendant Jaramillo opened this mail. Doc. 38-1 at 5; *see* Doc. 32-5 at 37.

Nothing before the Court indicates that opening this mail was done for an improper purpose.[17] The record indicates that Defendant Jaramillo did not believe mail from Dana Young was privileged. Doc. 38-1 at 5. Of course, if it was, as the Court assumes here, opening this mail outside of Plaintiff's presence was a violation of NMCD's policy. Doc. 32-2 at 2-3. But, "without more, a policy violation does not make a constitutional violation, *Williams v. Nix*, 1 F.3d 712, 717 (8th Cir. 1993), nor does it demonstrate improper motive." *Gonzales v. Martinez*, No. 14-CV-245, 2016 WL 9724284, at *8 (D.N.M. Oct. 20, 2016), *adopted* 2016 WL 9724831 (D.N.M. Nov. 15, 2016); *see also Williams v. Miller*, 696 F. App'x 862, 869-70 (10th Cir. 2017) ("Merely showing that [the defendants] may have violated prison policy is not enough." (citing *Hovater v. Robinson*, 1 F.3d 1063, 6068 n.4 (10th Cir. 1993))).

For these reasons, the Court concludes there is no genuine issue of material fact as to Plaintiff's claim concerning Dana Young's letter and Defendants are entitled to judgment as a matter of law.

---

[17]    In his single declaration made under penalty of perjury, Plaintiff states that the envelope was "haphazardly resealed with tape. Under the tape there is a bloody finger[]print from the person who opened the legal mail outside my presence." Doc. 73 at 148. So, essentially, it is Plaintiff's position that whoever opened this mail resealed it, though Defendants have presented evidence that it arrived "torn and taped." Doc. 32-5 at 37, 41. This is a non-issue because the Court assumes Defendant Jaramillo opened this mail, and it is certainly not evidence of an improper motive.

### III. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends the presiding judge **GRANT**

Defendants' Motion as follows:

(1) Enter summary judgment in favor of Defendants as to Counts Two and Four as

Plaintiff has abandoned those claims; and

(2) Enter summary judgment as to Counts One and Three in favor of Defendants as there

are no genuine disputes of material fact and Defendants are entitled to judgment as a matter of

law.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

**JOHN F. ROBBENHAAR**
United States Magistrate Judge